**J. Edward DAY, Appellant,**

v.

**William H. AVERY et al.**

**No. 75–1744.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 30, 1976.

Decided Nov. 10, 1976.

Rehearing Denied Dec. 8, 1976.

Certiorari Denied April 25, 1977.
See 97 S.Ct. 1706.

Austin F. Canfield, Jr., Washington, D.C., with whom Edward J. Gorman, Jr., Washington D.C., was on the brief for appellant.

James J. Bierbower, Washington, D.C., with whom Alvin B. Davis, Washington, D.C., was on the brief for appellees.

Before TAMM, ROBINSON and WILKEY, Circuit Judges.

PER CURIAM:

Appellant J. Edward Day brought suit in the Superior Court of the District of Columbia against Sidley & Austin (S&A), a prominent Chicago law firm, and the partners composing its executive committee, as the upshot of a dispute engendered by S&A's merger with another law firm in 1972. In separate counts of his complaint, appellant alleged, *inter alia,* breach of contract and misrepresentation. Service of process on the partnership was quashed and the case was thereafter removed to the United States District Court for the District of Columbia, which entered summary judgment for the individual defendants on all counts.[1] That judgment is now appealed on the merits of each claim for relief, as well as the propriety of the removal. We affirm the judgment in all respects.

## I. THE FACTUAL BACKGROUND

In 1963, appellant and S&A agreed that appellant would, upon his resignation as Postmaster General of the United States, establish an office of S&A in Washington, D.C. He did so, securing office space and supporting personnel for himself and for the small group of S&A attorneys who staffed the office. At the same time, appellant became an underwriting partner in the firm and chairman of its Washington office committee. He did not, however, become a member of the firm's executive committee, which under S&A's partnership agreement had plenary control over most of the firm's affairs calling for policy- or decision-making.[2] Appellant's role as chairman of the Washington office committee was principally that of liaison with and agent for the executive committee, rather than that of independent decision-maker.

1. *Day v. Sidley & Austin,* 394 F.Supp. 986 (D.D.C.1975).

2. Under S&A's 1970 partnership agreement, the executive committee consisted of underwriting partners elected by partners holding a majority of all voting percentages. The committee was empowered by the agreement to (1) reduce a partner's participation in the event of an "abnormal reduction" in his workload; (2) determine whether a partner was disabled; (3) request retired partners to serve as consultants to the firm; (4) determine certain portions of benefits payable on withdrawal or death of a partner; (5) give or withhold consent to a partner's request to practice law outside the firm; (6) determine "[a]ll questions of Firm policy, including determination of salaries, expense, Partners' participation, required balances of Partners, investment of funds, designation of Counsel, and the admission and severance of Partners," subject to approval by a voting majority of all the partners on matters of participation, admission and severance; (7) approve partners' service as fiduciaries or as directors of other enterprises, and determine whether partners so serving might retain fees; and (8) select an accounting firm for auditing purposes. J.App. 206–212.

Early in 1972, S&A's executive committee was approached by partners of another law firm—Liebman, Williams, Bennett, Baird & Minow (Liebman)—with an eye toward merger. Like S&A, Liebman was Chicago-based but maintained an office in Washington. Without then notifying other partners,[3] representatives of Liebman and S&A's executive committee explored the idea and thrashed out a tentative proposal. The possibility of merger was first broached to appellant and the other underwriting partners at a meeting on July 17, 1972, when the proposal was presented to them for consideration. In the course of the discussions, according to appellant, the executive committee made a series of statements to the underwriting partners about the contemplated merger, including a representation that no one of them would be "worse off" in any way as a result.[4]

Each underwriting partner, including appellant, voiced approval of the project, and commissioned the executive committee to devise a final-form merger agreement and submit it to the partners for adoption. Several other meetings were held to resolve merger issues during September and, although appellant found himself unable to attend any of them, one clause of the agreement was revised at his suggestion. A memorandum purporting to summarize the benefits of the merger was circulated under the aegis of the executive committee to all S&A partners on September 26, and that memorandum contained the statement that no partner would be "worse off" financially "solely as a result of the consolidation, than he or she was before the event."[5] After circulation and approval of a memorandum of understanding incorporating the details of the merger, a final amended partnership agreement consummating the merger was

executed on October 16, 1972, by all partners of S&A, including appellant.

That same day, the executive committee of the new firm—which took the name of "Sidley & Austin"—decided to consolidate the Washington offices of its predecessors. To this end, appellant and the head of the premerger Liebman Washington office committee, who was also a member of the post-merger executive committee, were named co-chairmen of the consolidated Washington office committee.[6] It was at this point that trouble began. Members of the post-merger Washington office committee, in combination with appellant's co-head, took actions that seemed to appellant to be in disregard of his role as co-chairman and in studied neglect of his wishes. The principal step was the relocation of the consolidated offices to another building in Washington, a move to which appellant was opposed. Appellant considered this course contumelious and alleges that it was motivated by opposition to his political leanings. These events, as well as the appointment of co-chairmen *simpliciter,* made continued service with the firm distasteful to appellant, who resigned and instituted the instant litigation.

## II.  REMOVAL OF THE ACTION

■  Appellant first challenges the District Court's jurisdiction. Removal of the case from the Superior Court of the District of Columbia rested on the theory that the S&A firm was not suable as an entity in the District of Columbia; that there was complete diversity of citizenship between appellant on the one hand and the defendant partners on the other; that the amount in controversy, exclusive of interest and costs, exceeded $10,000; and that since appel-

---

3.  Secrecy for the time being, quite understandably, was deemed necessary to protect against speculation and unrest while the proposal was still in a highly tentative stage.

4.  J.App. 235.

5.  J.App. 60.

6.  Appellant avers, and one defendant admits, that this arrangement was contemplated far earlier than October 16, 1972.

lant's action might originally have been brought in the District Court,[7] it was properly removable thereto.[8]  Since, however, an action involving no federal question cannot be removed to a federal court if any defendant is a resident of the forum state,[9] appellant contends that removal in this instance was improper.  His premise is that even though none of the partners sued individually resides in the District of Columbia, S&A, *qua* partnership, does so reside by virtue of its business activity here.

Federal Civil Rule 17(b)[10] provides that in cases not seeking enforcement of a substantive right[11] existing under the constitution or a federal law, capacity of a partnership to sue or be sued is determined by reference to the law of the forum state—in this case, the District.[12]  Since there is no statute in the District permitting suit by or against a partnership in its common name, and since by the common law of the District a partnership is not a jural entity capable of suing or being sued,[13] this argument would appear to be

7.  See 28 U.S.C. § 1332(a) (1970).

8.  "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a) (1975).

9.  28 U.S.C. § 1441(b) (1970); *Patch v. Wabash R. Co.,* 207 U.S. 277, 28 S.Ct. 80, 52 L.Ed. 204 (1907).

10.  "The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his domicile.  The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized.  In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, and (2) that the capacity of a receiver appointed by a court of the United States to sue or be sued in a court of the United States is governed by Title 28, U.S.C., §§ 754 and 959(a)."  Fed.R.Civ.P. 17(b).

11.  See note 10 *supra*.  Appellant endeavors to find a "substantive right" under federal law in the District of Columbia's "long arm" jurisdiction statute, enacted as a part of Pub.L. No. 91–358, 84 Stat. 548 (1970), the District of Columbia Court Reform and Criminal Procedure Act of 1970, and codified as D.C.Code §§ 13–401 *et seq.* (1973).  These statutes subject all "persons" meeting certain minimum contacts requirements to the jurisdiction of the local courts and, in § 13–421, defines "persons" as including partnerships and other sorts of unincorporated associations.  Appellant's claim, then, is that the long-arm statute gave him a "substantive right" to subject partnerships to personal jurisdiction in litigation in the District of Columbia.  That deviation from the

general rule of Rule 17(b), see note 10 *supra*, lacks the content and broad scope which the term "substance" possesses when it is juxtaposed to "procedure" in the argot of *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).  Rather, it represents an amplification of the doctrine of *UMW v. Coronado Coal Co.,* 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922), as interpreted by *Brown v. United States,* 276 U.S. 134, 141–142, 48 S.Ct. 288, 289–290, 72 L.Ed. 500, 503–504 (1928), that unincorporated associations might be sued on federal causes of action where the federal claims imply such a capacity to be sued, *e.g.,* antitrust actions.  While the term "substantive rights" has been interpreted to embrace every manner of claim for relief—whether constitutional, *e.g., Council No. 34, AFSCME v. Ogilvie,* 465 F.2d 221 (7th Cir. 1972); statutory, *e.g., Petrol Shipping Corp. v. Kingdom of Greece,* 2 Cir., 360 F.2d 103, *cert. denied,* 385 U.S. 931, 87 S.Ct. 291, 17 L.Ed.2d 213 (1966) (suit to compel arbitration under Federal Arbitration Act); *Price v. UMW,* 336 F.2d 771 (6 Cir. 1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965) (secondary boycott action under § 303 of the Labor Management Relations Act); implied from a criminal statute, *National Ass'n for Community Dev. v. Hodgson,* 356 F.Supp. 1399 (D.D.C.1973); or even developed as federal common law under § 301 of the LMRA, *Jersey Farms Milk Service, Inc. v. Amalgamated Meat Cutters,* 297 F.Supp. 1098 (M.D.Tenn. 1969)—Rule 17(b) has never recognized a federal substantive right other than a claim for relief, and certainly not a "right" akin to that asserted by appellant.

12.  Fed.R.Civ.P. 81(e).

13.  *Fennell v. Bache,* 74 App.D.C. 247, 250, 123 F.2d 905, 908, *cert. denied,* 314 U.S. 689, 62 S.Ct. 359, 86 L.Ed. 551 (1941); *Matson v. Mackubin,* 61 App.D.C. 102, 57 F.2d 941 (1932); *Mayflower Hotel Stockholders v. Mayflower Hotel Corps.,* 73 F.Supp. 721 (D.D.C.1947), *rev'd on other grounds,* 84 U.S.App.D.C. 275, 173 F.2d 416 (1949); see *National Ass'n for Community Dev. v. Hodgson, supra* note 11,

foreclosed. Appellant maintains, however, that Section 13–421 of the District of Columbia Code impliedly overrules the case law on this point by conferring personal jurisdiction over partnerships and other unincorporated associations meeting certain minimum contacts requirements.[14]

■ We note initially that the fact of personal jurisdiction does not ineluctably bestow legal capacity to be sued; infants and incompetents, for instance, were at common law incapacitated from suing or being sued,[15] and the fact that they were subject to personal jurisdiction did not alter the necessity of appointing a guardian ad litem.[16] More importantly, the genealogy of the District of Columbia's long-arm statute gives no indication that it was intended to do anything but "codify recent case law with respect to extraterritorial jurisdiction over and service upon persons in civil litigation."[17] It was adapted by Congress from the Uniform Interstate and International Procedure Act,[18] which in its pertinent comments assures that its adoption effects "no change" of rules "stating which persons have to be served in order to acquire jurisdiction," and that "thus, local law that all members of an unincorporated association must be joined and served . . . remains unchanged."[19] Since both the Uniform Act and its District of Columbia counterpart accord identical treatment to partnerships and unincorporated associations,[20] the law governing service on partnerships remains unchanged: the partnership entity is never to be served; rather, service must be made on all partners.[21]

■ *A fortiori*, then, the District's preexisting rules of suability are unaltered by the enactment of Section 13–421. In this connection, it is worth noting that one of Congress' purposes in adopting its provisions was closely to assimilate District law on jurisdiction to that of the neighboring

356 F.Supp. at 1402; *cf. United States v. A & P Trucking Co.,* 358 U.S. 121, 124, 79 S.Ct. 203, 206, 3 L.Ed.2d 165, 169 (1958).

14. See note 11 *supra.*

15. *Infants: Peak v. Shasted,* 21 Ill. 137, 74 Am.Dec. 83 (1859); *In re Beghtel's Estate,* 236 Iowa 953, 20 N.W.2d 421, 161 A.L.R. 1384 (1945); *Austin v. Charlestown Female Seminary,* 8 Metc. 196, 41 Am.Dec. 497 (Mass.1844); *Scott v. Royston,* 223 Mo. 568, 123 S.W. 454 (1909); *Manfull v. Graham,* 55 Neb. 645, 76 N.W. 19 (1898); *Drago v. Moso,* 1 Speers 212, 40 Am.Dec. 592 (S.C.1843); *Geilinger v. Gibbs* [1897] 1 Ch. 497. *Incompetents: Miller v. Hart,* 135 Ind. 201, 34 N.E. 1003, 1004 (1893).

16. Infants and incompetents were subject to suit only upon the appointment of a guardian ad litem or other representative responsible to the court. These might be appointed by the court itself once it acquired jurisdiction over the minor or incompetent by proper service of process. See *e.g., Miller v. Hart, supra* note 15, 34 N.E. at 1004; *Fulton v. Rosevelt,* 1 Paige Ch. 178, 19 Am.Dec. 409 (N.Y.1828). The party's infancy or incompetency did not deprive the court of jurisdiction, see *Jones v. Schaffner,* 193 Iowa 1262, 188 N.W. 787, 790 (1922); *Grattan v. Grattan,* 18 Ill. 167, 65 Am.Dec. 726, 729 (1856), and pleas of infancy were made by pleas in abatement and were not jurisdictional pleas, which had to be pleaded in bar. 1 Chitty, Pleading and Parties to Actions 446–48 (10th

Amer. ed. 1847); H. Stephen, Principles of Pleading 47 (9th Amer. ed. Heard 1867). Judgments improperly rendered against an infant who had not been represented by guardian ad litem were not void, as for lack of jurisdiction, but voidable. *Peak v. Shasted, supra* note 15; *Austin v. Charlestown Female Seminary, supra* note 15; *Manfull v. Graham, supra* note 15.

17. S.Rep. No. 405, 91st Cong., 1st Sess. 35 (1969).

18. 13 Uniform Laws Annotated (U.L.A.) 283 (1975).

19. *Id.* at 284, Commissioners' Comments to § 1.02. *Cf. id.* at 283, Comments to § 1.01: "In some cases the law of a state may require service on one or more specific individuals in order for jurisdiction to be acquired over a person"; *id.* at 298, § 2.03: "When the law of this state requires that in order to effect service one or more designated individuals be served, service outside this state under this Article must be made upon the designated individual or individuals."

20. D.C.Code § 13–421 (1973); Uniform Interstate and International Procedure Act § 1.01, 13 U.L.A. at 283 (1975).

21. *Matson v. Mackubin, supra* note 13.

states of Virginia and Maryland.[22] Virginia, though it has a nearly identical statute, denies partnerships capacity to sue or be sued,[23] as does at least one other state that has adopted the Uniform Act.[24] We conclude, then, that appellant's contention must be rejected and that removal was proper in the circumstances.[25]

## III. THE BREACH OF CONTRACT CLAIM

▆▆▆ Appellant disputes the District Court's finding, on which the breach-of-contract count of his complaint was held wanting, that he had no contractual right "to maintain his authority over the Washington office."[26] That effort, too, must fail. Neither S&A's pre-merger partnership agreement nor the amended partnership agreement governing post-merger operations refers to the Washington office committee or to appellant's position thereon. The pre-merger agreement, however, does provide that "[a]ll questions of Firm policy," except for certain enumerated matters not here relevant, shall be decided by the executive committee, which "shall advise and consult with other Partners to such an extent as

the Committee may deem advisable."[27] Clearly the establishment of the Washington office committee, its staffing and tenure upon it all fell under the rubric "firm policy," and as such were committed to the discretion of the executive committee. And insofar as there were techniques for "advising and consulting" with other partners, recourse to them was expressly left to the committee's own good sense and no abuse here is apparent. That agreement, moreover, specifically incorporated special agreements with several other partners but omitted reference to any idiosyncratic arrangement with appellant that might limit the executive committee's prerogative in that regard.

Beyond these considerations, both the pre- and post-merger partnership agreements empowered the executive committee to establish, determine the chairmanship and composition of and abolish at will, any subordinate committee of the firm.[28] We are unable to perceive any basis upon which it might soundly be concluded that the appointment of two chairmen for the firm's new Washington office committee was not well within the committee's authority.

22. S.Rep.No.405, 91st Cong., 1st Sess. 35 (1969); H.R.Rep.No.907, 91st Cong., 1st Sess. 61 (1970); *Margoles v. Johns*, 157 U.S.App. D.C. 209, 212–213, 483 F.2d 1212, 1215–1216 (1973).

23. *McCormick v. Romans*, 214 Va. 144, 198 S.E.2d 651 (1973).

24. *Roberts-Haverhill Associates v. City Council of Haverhill*, 319 N.E.2d 916 (Mass.App.1974).

25. Since we find that S&A, *qua* partnership, may not be sued in the District of Columbia, we need not inquire into the "residence" of the partnership, either for purposes of determining whether there is diversity, see *United Steelworkers of America v. R. H. Bouligny, Inc.*, 382 U.S. 145, 150, 86 S.Ct. 272, 274–275, 15 L.Ed.2d 217, 220 (1965); *Fifty Associates v. Prudential Ins. Co. of America*, 446 F.2d 1187, 1190 (9th Cir. 1970); or for evaluating venue in the District of Columbia, see *Denver & Rio Grande Western R. Co. v. Brotherhood of R.R. Trainmen*, 387 U.S. 556, 560, 87 S.Ct. 1746, 1748–1749, 18 L.Ed.2d 954, 958 (1967); *Penrod Drilling Co. v. Johnson*, 414 F.2d 1217, 1221 (5 Cir.

1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 495 (1970).

26. *Day v. Sidley & Austin, supra* note 1, 394 F.Supp. at 992.

27. J.App. 221.

28. The 1970 Partnership Agreement made no mention of any Firm committee other than the executive committee, which was to decide "[a]ll questions of Firm policy," and might "advise and consult with other Partners to such an extent as the Committee may deem advisable and in the best interest of the Firm." J.App. 212. The 1972 Agreement retains all of the above verbiage, together with some more specific language:

The Executive Committee shall appoint a Management Committee and such subordinate administrative committees as it may deem advisable. The Management Committee shall have general responsibility and authority for the administration of the affairs of the Firm and general supervision over the administrative committees.

It is well settled[29] that where, as here, a written agreement purportedly represents the parties' complete expression of their relationship, neither is at liberty to modify any of its terms by parol evidence.[30] This wholesome principle safeguards the integrity of partnership agreements no less than others.[31] And quite apart from the parol evidence questions raised by appellant's attempt to supply an additional unwritten term to his relations with S&A,[32] its absence from an otherwise carefully drawn document covering the complex operations of a large law firm requires, as the District Court noted, "a measured explanation which [appellant] does not supply."[33] We sustain the court's finding that no foundation for appellant's breach-of-contract claim was shown.

## IV. THE MISREPRESENTATION CLAIM

Count three of appellant's complaint alleges, and seeks damages for, several mis-representations made by members of S&A's executive committee to the underwriting partners assembled in the pre-merger meeting of July 17, 1972. The District Court gave summary judgment against appellant on this count on the theory that he was deprived of no legal right as a consequence of his reliance on any misrepresentation charged.[34] We reach the same result, though on different grounds.

■ Of the misrepresentations alleged, the only one that need concern us[35] is the observation by one of the members of the executive committee that "no Sidley partner would be worse off as a result of the merger."[36] Since an action for misrepresentation[37] generally will lie only if there has been a conscious misrepresentation of a material fact,[38] a statement that one would or would not be worse off in the future—whether characterized as a prediction, opin-

---

29. Since in all material respects save possibly one, see note 67 *infra*, the substantive law of Illinois and the District of Columbia is substantially harmonious, we need not inquire which is controlling on the substantive questions presented on this appeal.

30. *E. g., Murray v. Lichtman*, 119 U.S.App.D.C. 250, 251, 339 F.2d 749, 751 (1964) (quoting 3 A. Corbin, Contracts § 573 (1960)); *Gibson v. United States*, 106 U.S.App.D.C. 10, 12–13, 268 F.2d 586, 588–589 (1959). See generally 9 J. Wigmore, Evidence § 2425 (3d ed. 1940).

31. *E. g., Parish v. Howard*, 459 F.2d 616, 618 (8th Cir. 1972); *Van Fleet-Durkee, Inc. v. Oyster*, 91 Cal.App.2d 411, 205 P.2d 32 (1949).

32. Oral evidence may be adduced to show that an agreement in writing never became effective, 4 S. Williston, Contracts § 634 (3d ed. Jaeger 1961), as where there is fraud in the inducement or a condition precedent remaining unsatisfied. Appellant does not aver facts that would suggest that his 1963 agreement with S&A or its 1970 partnership agreement is vitiated by fraud, but he does characterize his continuation as head of the Washington office as a condition precedent to their operation. Appellant thus asks us to postulate the existence of a condition that could not be satisfied until he had left S&A, that is, until the contract had been fully performed. Such a characterization does not fit within the definition of conditions precedent as "facts and events . . . that must exist or occur before there is a right to immediate performance, before there is a breach of duty, before the usual judicial remedies are available." 3A A. Corbin, Contracts § 628 at 16 (1960); 5 S. Williston, Contracts, *supra* at § 666A.

33. *Day v. Sidley & Austin, supra* note 1, 394 F.Supp. at 991.

34. *Id.* at 992.

35. Appellant also alleged deliberate misstatements as to the future plans of two Liebman partners and the resolution of a potential conflict of interest between the clients of the merged firm. Neither the District Court nor we can discern a meritorious claim for relief in these allegations. See 394 F.Supp. at 991.

36. J.App. 235. As we have already noted, a substantially similar statement appeared in a memorandum circulated to S&A partners shortly before approval of the merger. See text *supra* at note 5.

37. The tort is frequently spoken of as "deceit," since the action of deceit was the appropriate remedy under the early common law. See W. Prosser, Torts § 105 at 684–686 (4th ed. 1971).

38. *Id.* § 105 at 685; 1 F. Harper & F. James, Torts § 7.8 (1956).

ion or promise [39]—ordinarily would not be a sufficient predicate for such an action as between parties truly dealing at arms' length.[40]

Where circumstances indicate that the parties did not stand in a position of parity and normal wariness with respect to the subject of the representation, however, exceptions have been carved out of the general rule.[41] Most of these exceptions derive their legitimacy from circumstances that would lead the reasonable person to believe that implicit in the prediction or opinion is an assertion of fact upon which the recipient of the representation might prudently rely. Where the person making the representation occupies a fiduciary or other position of trust for the recipient of his remarks, for instance, the recipient may be justified in assuming the correctness not only of factual representations

but also of opinions.[42] The intuitive basis for this result may be the thought that a fiduciary voicing an opinion on which he knew his beneficiary might depend would be understood as having investigated the facts underlying it; thus, the expression of the opinion carried an implicit representation of those facts. Since partners as to partnership matters are fiduciaries *inter se*,[43] it is often found that partners were entitled to rely on the opinions of their colleagues.[44]

Another exception to the general requirement that the misrepresentation be one of existing fact appears in the situation where the speaker may reasonably be understood as having based an opinion or prediction on facts that are unavailable to the listener either because he does not have access to them or because he is obviously incapable of interpreting them.[45] Still a

---

39. A promise or contractual commitment may be actionable as a misrepresentation if at the time of its making the promisor had no intention of carrying it out. W. Prosser, Torts § 109 at 729–730 (4th ed. 1971); 1 F. Harper & F. James, Torts § 7.10 at 571–574 (1956). Although it is possible to infer such an intention from the actions and circumstances of the promisor, see W. Prosser, *supra*, § 109 at 730, appellant does not aver, and we cannot conceive, that the assertion in question was intended as a promise.

40. W. Prosser, Torts § 109 at 728 (4th ed. 1971); F. Harper & F. James, Torts § 7.8 at 561 (1956). Professor Prosser attributes this rule to "the highly individualistic attitude of the common law toward the bargaining transactions with which the law of deceit has developed." W. Prosser, Torts § 109 at 721.

41. W. Prosser, Torts § 109 at 728 (4th ed. 1971); F. Harper & F. James, Torts § 7.8 at 561 (1956).

42. *Ringer v. First Nat'l Bank of Stevenson*, 291 Ala. 364, 281 So.2d 261, 267 (1973); *Ogier v. Pacific Oil & Gas Dev. Corp.*, 132 Cal.App.2d 496, 282 P.2d 574, 580 (1955); W. Prosser, Torts § 109 at 726 (4th ed. 1971); F. Harper & F. James, Torts § 7.8 at 563–564 (1956); see *Illinois Rockford Corp. v. Kulp*, 41 Ill.2d 215, 242 N.E.2d 228 (1968); cf. *Riss & Co. v. Feldman*, 79 A.2d 566, 571 (D.C.Mun.Ct.App.1951); see also *Meinhard v. Salmon*, 249 N.Y. 458, 463–464, 164 N.E. 545, 546, 62 A.L.R. 1 (1928).

43. Uniform Partnership Act § 21, enacted as D.C.Code § 41–320 (1973), and as Ill.Rev.Stat.

ch. 106½ § 18 (1973); *Peterson v. Tharp*, 299 F.2d 434 (5th Cir.), cert. denied, 371 U.S. 889, 83 S.Ct. 184, 9 L.Ed.2d 122 (1962); *Homestake Mining Co. v. Mid-Continent Exploration Co.*, 282 F.2d 787, 799 (10th Cir. 1960); *Riss & Co. v. Feldman*, *supra* note 42; *Clement v. Clement*, 436 Pa. 466, 260 A.2d 728 (1970); A. Bromberg, J. Crane & A. Bromberg, Partnership § 68 (1968); cf. *Dresden v. Willock*, 518 F.2d 281, 287 (3rd Cir. 1975) (co-owners of business may be fiduciaries in some circumstances); *Illinois Rockford Corp. v. Kulp*, *supra* note 42 (same); *Frankfort Oil Co. v. Snakard*, 279 F.2d 436, 443 (10th Cir.), cert. denied, 364 U.S. 920, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960) (joint venturers are fiduciaries).

44. *Wolf v. Brungardt*, 215 Kan. 272, 524 P.2d 726 (1974); *Clement v. Clement*, *supra* note 43; *Herring v. Offutt*, 266 Md. 593, 295 A.2d 876, 879 (1972); see *Lewis v. State Bar*, 9 Cal.3d 704, 108 Cal.Rptr. 821, 511 P.2d 1173 (1973) (same in disbarment proceeding).

45. *Ryan v. Glenn*, 489 F.2d 110, 114 (5th Cir. 1974); *Carroll v. First Nat'l Bank of Lincolnwood*, 413 F.2d 353, 358–359 (7th Cir. 1969), cert. denied, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970); *Riss & Co. v. Feldman*, *supra* note 42; *Vokes v. Arthur Murray, Inc.*, 212 So.2d 906, 909, 28 A.L.R.3d 1405 (Fla.App. 1968); *Wolf v. Brungardt, supra* note 44; *Ragsdale v. Kennedy*, 286 N.C. 130, 209 S.E.2d 494, 500–501 (1974); Restatement, Torts § 525 (1938); cf. *Dresden v. Willock*, *supra* note 43.

third exception is based upon the logical assumption that one who asserts that a future event will come to pass impliedly warrants that he knows of no fact that will prevent its occurrence.[46]

We need not decide whether any of these circumstances, standing alone, would support an action for misrepresentation based on opinion or prediction for, taking appellant's averments to be true, all these factors are present in this case. Both sides agree that although appellant was an underwriting partner, the structure of the firm was such that in many ways he was never master of his own ship. When the executive committee member asserted that no one, including appellant, would be worse off as a result of the merger, appellant was entitled to rely on that opinion—the opinion of one who not only was his partner and hence a fiduciary but who also occupied a special position of trust and confidence by virtue of the control[47] he wielded over appellant's fortunes with S&A.[48] Furthermore, the speaker might well have been understood by appellant as having based his statement on a great deal of information to which, as both sides agree, appellant did not have access; appellant's ascertainment of the past and present prospects not only of the Liebman firm but also of his own was hampered by the secrecy surrounding the inter-

nal dealings on the merger proposal, to which all of the defendants were admittedly privy.[49] Certainly appellant was justified in accepting the conclusion of a partner armed with superior knowledge of the underlying facts, at least to the extent of assuming that the partner knew of no facts that would prevent his own prophecy from being fulfilled. And finally, the prediction in question was of a state of affairs the occurrence of which was partly in the hands of the declarant and his compatriots on the executive committee. Appellant might reasonably presume that the committee would not forecast one future and then work actively to bring about quite a different one.[50]

Taking, then—as we are required, for purposes of evaluating the District Court's grant of summary judgment to do—all facts averred by appellant as true and indulging all reasonable inferences from his averments, we must view the situation as though the defendant partners made or caused to be made a material misrepresentation in the form of an opinion on which appellant might justifiably accept. We must also assume arguendo that the inaccuracy of the assertion was known to the defendants at the time it was made, that they intended that appellant rely upon it, and that in fact he did rely upon it.[51] Still,

---

**46.** *United States v. Herr,* 338 F.2d 607, 610 (7th Cir. 1964), *cert. denied,* 382 U.S. 999, 86 S.Ct. 563, 15 L.Ed.2d 487 (1966); W. Prosser, Torts § 109 at 728 (4th ed. 1971); F. Harper & F. James, Torts § 7.10 at 791 (1956). *Cf.* Restatement, Torts § 525, Comment (e) (1938):

A statement in form a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable.

**47.** See note 2 *supra.*

**48.** Appellant avers that part of the reason why he relied upon the alleged misrepresentation is that he "had always trusted the Defendants who had assumed management of the firm. In addition, they had control over my status and income." J.App. 233.

**49.** See note 5 *supra* and accompanying text.

**50.** *Compare* the authorities cited *supra* note 31 with those holding promisors liable in misrepresentation for promises made with an intention never to carry them out. *United States v. Herr, supra* note 46, 338 F.2d at 610; *United States v. 1,557.28 Acres of Land,* 486 F.2d 445, 447–448 (10th Cir. 1973); *Brooks v. Parr,* 507 S.W.2d 818 (Tex.Civ.App.1974); W. Prosser, Torts § 109 at 730–731 (4th ed. 1971).

**51.** Numerous authorities caution that summary judgment is not ordinarily appropriate in cases posing an issue as to state of mind. *Bouchard v. Washington,* 168 U.S.App.D.C. 402, 404 n.20, 514 F.2d 824, 830 n.20 (1975); *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 34, 365 F.2d 965, 967 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *Dewey v. Clark,* 86 U.S.App.D.C. 137, 144, 180 F.2d 766, 773 (1950); *Riley-Stabler Constr. Co. v. Westinghouse Elec. Corp.,* 396 F.2d 274, 277 (5th Cir. 1968).

we find, appellant did not establish all of the essential elements of his claim.

■■■ A necessary ingredient of the tort of misrepresentation—as, in olden times, of any action on the case [52]—is that the claimant suffer harm by reason of the tortious conduct.[53] Appellant has demonstrated no ability to prove, in the event of a trial, any causal connection between the misrepresentation and the injury which he charges. The only damage to which he points was his outraged sensibilities, which assertedly flowed not from the pre-merger prediction that no one would be worse off, but from the executive committee's action in regard to stewardship of the post-merger Washington office. The legal immateriality of the alleged misrepresentation—in effect, the concealment of a plan to depose appellant as head of the Washington office after the merger—becomes apparent when it is recognized that the same result would almost certainly have obtained had appellant been fully informed of every intention he avers the executive committee harbored. If appellant had known that the merger was to be a springboard for lowering his status in the Washington office, as he now claims it was, he could not alone have prevented consummation of the merger. In any determination of the relations of partners *inter se*, the primary reference is to the terms of the partnership agreement; [54] and under S&A's pre-merger partnership agreement, appellant's vote was not necessary to effect the merger nor sufficient to defeat it.[55] Although it is not absolutely inconceivable that he could have persuaded his colleagues to preserve his authority over the Washington office by rejecting the merger, he avers no facts from which such a probability might realistically be inferred. Had the putative design of the executive committee surfaced earlier, it is not impossible that appellant could by force of moral suasion have prevented its fulfillment, but this too is a matter of sheer speculation.

**52.** C. McCormick, Damages § 22 at 87–88 (1935); W. Prosser, Torts § 7 at 28–29 (4th ed. 1971); see R. Heusten, Salmond on the Law of Torts 6 (16th ed. 1973):

> In case, damage is the gist of the action, and the plaintiff will fail if he cannot prove it. But in trespass it is not necessary to prove actual damage. Trespass is actionable *per se*.

**53.** *Isen v. Calvert Corp.*, 126 U.S.App.D.C. 349, 353, 379 F.2d 126, 130 (1967); *Ritchie v. Landau*, 475 F.2d 151, 156 (2d Cir. 1973); *Seattle First Nat'l Bank v. Hilltop Realty*, 383 F.2d 309, 313 (9th Cir. 1967), *cert. denied*, 390 U.S. 1025, 88 S.Ct. 1411, 20 L.Ed.2d 282 (1968); *Kaufman v. Mellon Nat'l Bank & Trust Co.*, 366 F.2d 326, 331 (3rd Cir. 1966); *Lack Indus., Inc. v. Ralston Purina Co.*, 327 F.2d 266 (8th Cir. 1964); *Jones & Laughlin Steel Corp. v. Sedalia Indus. Loan & Inv. Co.*, 315 F.2d 58 (8th Cir. 1963); W. Prosser, Torts § 110 at 731 (4th ed. 1971); F. Harper & F. James, Torts § 7.15 at 590–591; C. McCormick, Damages § 22 at 88–89 (1935); Restatement, Torts § 546 (1938); Restatement (Second) of Torts § 548A (Tentative Draft No. 10, 1964).

**54.** *Holmes v. Keets*, 80 U.S.App.D.C. 327, 328–329, 153 F.2d 132, 133–134 (1946); see *Liechty v. Liechty*, 231 N.W.2d 729, 731 (N.D.1975), quoting A. Bromberg, J. Crane & A. Bromberg, Partnership § 5 at 43 (1968). The Uniform Partnership Act, in force in both Illinois and the District of Columbia, provides for the operation of statutory rules prescribing the rights and duties of partners *inter se* "subject to any agreement" between them. D.C.Code § 41–317 (1973); Ill.Rev.Stat. ch. 106½, § 1 et seq. (1973). Several courts have assumed in dicta that this provision means that statutory requirements for the admission of partners may be overridden by an agreement providing otherwise, although no court seems to have specifically decided the question. See, *e. g., Johnson v. Hill*, 1 Ariz.App. 290, 402 P.2d 225, 226 (1965), quoted in *Troupe v. Seby*, 416 F.2d 514, 519 (9th Cir. 1969); *Polikoff v. Levy*, 55 Ill. App.2d 229, 204 N.E.2d 807, *cert. denied*, 382 U.S. 903, 86 S.Ct. 237, 15 L.Ed.2d 156 (1965); *Rapoport v. 55 Perry Co.*, 50 A.D.2d 54, 376 N.Y.S.2d 147, 149 (1975). This construction is buttressed by holdings that an agreement in abrogation of the statutory provisions on dissolution of partnerships is valid under the Uniform Partnership Act. *Stuart v. Overland Medical Center*, 510 S.W.2d 494, 498–499 (Mo. App.1974); *Gibson v. Angros*, 30 Colo.App. 95, 491 P.2d 87, 90–91 (1971); see *Johnson v. Hill, supra*.

**55.** The agreement provided that admission of new partners could be effected only by assent of partners holding the majority of all voting percentages. Appellant held only a minority of those percentages, and all other underwriting partners voted to approve the merger, so even if his vote was vitiated by misrepresentation, an ample majority continued to exist.

Nor can injured feelings attendant upon the executive committee's appointment of co-chairmen for the Washington office committee and its disregard of appellant's views on relocation of the office be said to derive an actionable character from any concealment of purpose as charged by appellant. Those actions were, as we have seen, exertions of contractual prerogatives which could have been exercised with equal facility either way.[56]

▮ Without a doubt, appellant felt gravely offended by what he deems wrongdoing by the executive committee, but a *sine qua non* of any recovery for misrepresentation is a showing of pecuniary loss proximately caused by reliance on the misrepresentation.[57] Save for appellant's inability to survive this requirement, he would be entitled to a trial on his misrepresentation count and, if proven circumstances

warranted, to the jury's consideration of an award of punitive as well as compensatory damages.[58] But, as a leading commentator in the torts field explains, "[s]ince the modern action of deceit[59] is a descendant of the older action on the case, it carries over the requirement that the plaintiff must have suffered substantial damage before the cause of action can arise. Nominal damages are not awarded in deceit, and there can be no recovery if the plaintiff is none the worse off for the misrepresentation, however flagrant it may have been,"[60] and that is precisely the situation here. We are mindful of the so-called federal rule, which obtains in the District of Columbia, that punitive damages are allowable even in the absence of compensatory damages,[61] but we think the rule is inapplicable here. Almost all of the decisions applying that principle have dealt either with trespass to the person or property[62] or with libel or slander

---

**56.** Since the breach of a fiduciary relationship is not actionable unless injury accrues to the beneficiary or the fiduciary profits thereby, see, *e. g.*, Restatement (Second) of Trusts § 205 (1959), and since neither injury to appellant nor profit to any appellee can be shown to flow from any nondisclosure complained of, appellant's allegation of breach of a fiduciary duty by nondisclosure must also fail. Thus we need not reach the question whether the partnership agreement reposes such authority in the executive committee that it might be said to amount to a waiver of disclosure.

**57.** See cases cited *supra* note 53.

**58.** In the District of Columbia, proof of fraudulent misrepresentation is itself sufficient to support an award of punitive damages, because of the state of mind rendering it fraudulent. *Harris v. Wagshal*, 343 A.2d 283, 288 (D.C.Ct.App. 1975); *District Motor Co. v. Rodill*, 88 A.2d 489, 492–493 (D.C.Mun.App.1952).

**59.** See note 37 *supra* and accompanying text.

**60.** W. Prosser, Torts § 110 at 731 (4th ed. 1971). See, *e. g.*, *Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp.*, 325 F.2d 2, 22 (3d Cir. 1963) (Pennsylvania law); *Durham v. New Amsterdam Cas. Co.*, 208 F.2d 342, 345 (4th Cir. 1953) (Virginia law); *Ollier v. Lake Cent. Airlines, Inc.*, 423 F.2d 554, 556 (6th Cir. 1970) (Ohio law); *Geach v. Olsen*, 211 F.2d 682, 685 (7th Cir. 1958) (Illinois law); *Holliday v. Great Atlantic & Pacific Tea Co.*, 256 F.2d 297, 300 (8th Cir. 1958); *PSG Co. v. Merrill Lynch, Pierce, Fenner & Smith*, 417 F.2d 659,

663 (9th Cir.), *cert. denied*, 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1960) (Oregon law); *Klingbiel v. Commercial Credit Corp.*, 439 F.2d 1303, 1309 (10th Cir. 1971) (Kansas law); *Fischer Constr. Co. v. Fireman's Fund Ins. Co.*, 420 F.2d 271, 277 (10th Cir. 1970) (Oklahoma law), holding that actual damages are always a predicate for punitive damages. But see *Kelite Prods. Co. v. Binzel*, 224 F.2d 131, 145 (5th Cir. 1955) (Alabama law allows punitive damages in action on the case without compensatory damages) (dicta).

**61.** *Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc.*, 168 U.S.App.D.C. 149, 164 n.108, 513 F.2d 407, 422 n.108 (1975); *Davis v. Schuchat*, 166 U.S.App.D.C. 351, 358 n.7, 510 F.2d 731, 738 n.7 (1975); *Rogers v. Loether*, 467 F.2d 1110, 1112 n.4, *aff'd*, (7th Cir.), 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1972); *Wardman-Justice Motors v. Petrie*, 59 U.S.App.D.C. 262, 39 F.2d 512 (1930); *Washington Post Co. v. O'Donnell*, 43 App.D.C. 215, 240, *cert. denied*, 238 U.S. 625, 35 S.Ct. 663, 59 L.Ed. 1495 (1915); *Harris v. Wagshal*, *supra* note 58, 343 A.2d at 288; *United Sec. v. Franklin*, 180 A.2d 505, 511 (D.C.Ct.App.1962); *First Nat'l Realty Co. v. Weathers*, 154 A.2d 548 (D.C.Ct. App.1959); *De Foe v. Potomac Elec. Power Co.*, 123 A.2d 920 (D.C.Mun.App.1956).

**62.** *E. g.*, *Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc.*, *supra* note 61 (trespass); *American Home Life Ins. Co. v. Cerrone*, 43 App.D.C. 508, 512 (1915) (trespass); *Basista v. Weir*, 340 F.2d 74, 87 (3d Cir. 1965) (assault and false imprisonment).

per se [63]—all of which were actionable at common law without specific proof of resulting damages.[64] To action on the case—the common law remedy for misrepresentation [65]—developed later in history, and from the beginning its emphasis was on compensation for injuries actually sustained rather than on redress of symbolic grievances.[66] In any event, since appellant has not contended that he is entitled to punitive damages without a concomitant recovery of compensatory damages,[67] we do not pursue the point further.[68]

We conclude, then, that no compensable harm to appellant from the conduct complained of has been indicated. It follows that as a matter of law the defendant partners could not be held on the misrepresentation count and that summary judgment thereon was proper.

The judgment appealed from is

*Affirmed.*

**63.** *Davis v. Schuchat, supra* note 61; *Afro-American Publishing Co. v. Jaffe,* 125 U.S.App. D.C. 70, 83, 366 F.2d 649, 662 (D.C.Cir.1966); *Washington Post Co. v. O'Donnell, supra* note 61, 43 App.D.C. at 240; *Reynolds v. Pegler,* 223 F.2d 429, 434 (2d Cir. 1955); *Press Publishing Co. v. Monroe,* 73 F. 196, 200–201 (2d Cir. 1896). Several other of the cases asserting the federal rule awarded damages under statutory provisions that could be read as supporting a claim for punitive damages as a redress of a "symbolic grievance." See, *e. g., Rogers v. Loether, supra* note 61, 467 F.2d at 1112 (housing discrimination); *Basista v. Weir, supra* note 62 (false imprisonment by officer); see *Gill v. Manuel,* 488 F.2d 799 (9th Cir. 1973).

**64.** C. McCormick, Damages § 22 (1935); W. Prosser, Torts § 7 at 29; see R. Heusten, Salmond on the Law of Torts 6 (16th ed. 1973), quoted *supra* note 52.

**65.** F. Harper & F. James, Torts § 7.15 at 590 (1956); W. Prosser, Torts § 105 at 685 (4th ed. 1971); T. Plucknett, A Concise History of the Common Law at 640–641 (5th ed. 1956); *cf.* Note, Deceit and Negligent Misrepresentation in Maryland, 35 Md.L.Rev. 651 n.7 (1976).

**66.** W. Prosser, Torts § 7 at 28 (4th ed. 1971); see C. McCormick, Damages § 83 at 293 (1935):
> It seems to be agreed without dissent that the allowance of exemplary damages does not widen the range of actionable wrongs . . . . Consequently, the first inquiry must be, Does the complaint state a cause of action if the allegations relied upon solely to support the claim for exemplary damages be disregarded? If it does not, it is insufficient, and the claim for exemplary damages collapses with the rest of the case.

*Cf. Cassell & Co. Ltd. v. Broome* [1972] A.C. 1027, 1076 (Lord Hailsham L.C.), disapproving *Mafo v. Adams* [1970] 1 Q.B. 548, 558; Lord Hailsham asserting that punitive damages will not lie for deceit, though they will lie for actions such as defamation, intimidation, false imprisonment, malicious prosecution, trespass to land, persons or goods, conspiracy, and (by statute) infringement of copyright. 12 Halsbury's Laws of England § 1189 (4th ed. 1975).

**67.** The District of Columbia Court of Appeals has suggested in dicta that in suits for misrepresentation damages may be awarded even absent compensatory damages. *Harris v. Wagshal, supra* note 58, 343 A.2d at 288 n.13; *United Sec. Corp. v. Franklin, supra* note 61, 180 A.2d at 511. This is by far the minority view. See cases cited *supra* note 60. *Cf. Klein v. Spear, Leeds & Kellogg,* 306 F.Supp. 743 (S.D. N.Y.1969), asserting that the majority rule is not that compensatory damages must actually be awarded, but that compensable injury must be shown, in order to qualify for an award of punitive damages. See C. McCormick, Damages § 83 at 293–294. *Harris v. Wagshal, supra* note 58, and *United Sec. Corp. v. Franklin, supra* note 61, both may be seen to fall within this construction of the rule. The District of Columbia court has yet to apply its suggestion, and it has also declared that punitive damages are not favored. *Riggs Nat'l Bank v. Price,* 359 A.2d 25, 28 (D.C.App.1976), citing *Brown v. Coates,* 102 U.S.App.D.C. 300, 253 F.2d 36 (1958). We are, therefore, reluctant to make so drastic a departure from prior law without more explicit guidance.

**68.** *United States v. Edmonds,* 173 U.S.App.D.C. 241, 243 n.11, 524 F.2d 62, 64 n.11 (1975); *Democratic Cent. Com. v. Washington Metropolitan Area Transit Comm'n,* 158 U.S.App. D.C. 7, 11 n.16, 485 F.2d 786, 790 n.16, *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1973); and cases cited therein. Fed.R. App.P. 20, 28(a)(4).